IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MARLON BACON<br><br>Plaintiff,<br><br>v.<br><br>MERAKEY PHILADELPHIA<br><br>Defendant. | Civil Action No. 2:21-cv-04547-MSG |

<u>MEMORANDUM OPINION</u>

**Goldberg, J.**                                                                                           August 31, 2023

      This case involves allegations of gender discrimination and unlawful retaliation under Title VII and the Pennsylvania Human Relations Act ("PHRA"). Marlon Bacon ("Plaintiff"), a former supervisor at Merakey Philadelphia ("Defendant"), alleges that his female supervisor discriminated against him based on his gender when she allegedly declined to provide him with the same level of support and training as his female peers, spoke to him in an unpleasant manner, and declined to assist him in managing his subordinates. Plaintiff claims that he was terminated in retaliation for reporting this conduct to the human resources department and upper-level management. Defendant now moves for summary judgment. For the foregoing reasons, Defendant's motion will be granted as to both claims.

**I.     STATEMENT OF FACTS**

      The following record is derived from Defendant's Statement of Facts (the "SOF") together with exhibits of record and supplemented with Plaintiff's Response to the SOF (the "Response").

1

The parties' factual disagreements are noted where relevant. The facts are otherwise uncontested as presented.

### A. The Parties

Defendant Merakey Philadelphia is a non-profit organization that provides care to adults living with addiction and mental health issues. As part of this work, Defendant operates "Supported Living Facilities" or "houses" where Merakey employees provide direct support to residents in the form of medication management, life coaching, and assisted living. These direct support and facility staff are supervised by Merakey program directors. The program directors are supervised by residential directors, who in turn report to the executive director. New Merakey employees are placed under an initial 180-day probationary period during which their employment is "at will" and they may be terminated for any reason without notice and without procedural protections. (SOF at ¶¶ 1-3, 8, ECF No. 18); (SOF, Ex. 6, Deposition of Marlon Bacon ("Plaintiff Dep.") at 17:10-13); (SOF Ex. 7, Deposition of Renee Alexander ("Alexander Dep."), at 18:9-20:5); (SOF Ex. 1, Affidavit of Dr. Paul Sachs ("Sachs Affidavit"), at ¶¶ 1, 3).

Plaintiff Marlon Bacon, who is male, was hired on July 22, 2019, as a program director and was given supervisory responsibility over six houses and approximately forty support and facilities staff. At least three other program directors were employed by Defendant during the same period, all of whom were women. Each of these program directors reported to Renee Alexander ("Alexander"), a female residential director for Merakey. Plaintiff initially applied for a different position for which he did not receive an offer. During that process, a Merakey employee gave Plaintiff's resumé to Alexander, who interviewed and ultimately hired Plaintiff. There was at least one other residential director in the same department during the relevant period: Melissa Beckman Nalliah ("Nalliah"), also a woman. Alexander and Nalliah were supervised by Paul Sachs, a man

2

and former executive director at Merakey. These employees were each supported by the Merakey Human Resources ("HR") team, which includes Cheryl Cotton ("Cotton") and her supervisor, Melissa Bush ("Bush"). (SOF at ¶¶ 4, 8-11, 15-19, 23, 26); (Plaintiff Dep. at 17:10-13); (Alexander Dep. at 18:9-22, 19:3-20:5); (SOF, Ex. 12, Email Exchange between Nalliah and Cotton); (SOF, Ex. 9, Deposition of Cotton ("Cotton Dep.") at 25:2-4, 36:3-13).

### B. Factual Basis of Plaintiff's Allegations

By all accounts, Plaintiff had a difficult tenure at Merakey. Plaintiff alleges that his female supervisors discriminated against him and treated him unfairly because of his gender. He claims that his supervisor, Alexander, often spoke to him in a condescending, demeaning, and aggressive tone, but did not speak in this way to female staff members. Plaintiff's factual allegations are as follows:

- When Alexander would arrive in the morning, she would speak to her administrative assistant, but not to Plaintiff. (Plaintiff Dep. at 32:11-24).

- During a time in which Alexander and three other employees were scheduled to have a meeting with Plaintiff, the four instead met in Alexander's office to celebrate her birthday. The gathering lasted around 20 minutes. Plaintiff was not invited to join them, though he concedes that no work-related topics were discussed in his absence. (Plaintiff Dep. at 39:14-41:14); (SOF at ¶ 50).

- During an interview with a potential subordinate, with Alexander and two fellow program directors in attendance, Alexander allegedly "chastised" Plaintiff for checking his phone after receiving what he believed to be a work-related call. Later in that meeting, the other female program directors allegedly took calls but did not receive the same criticism. In her deposition, Alexander claimed that she merely leaned over to Plaintiff and said, "[y]ou should excuse yourself." (SOF at ¶ 51, 61); (Plaintiff Dep. at 32:25-33:25). (Alexander Dep. at 29:10-30:15).

- During the same interview, Alexander corrected Plaintiff after he introduced himself as the "program manager" and proceeded to engage in a discussion with another program director about the differences between the respective roles of "program manager" and "program director." Plaintiff had believed the titles to be interchangeable and found this exchange embarrassing. (SOF at ¶ 61); (Plaintiff Dep. at 34:1-36:4).

- Plaintiff arrived fifteen minutes late to a meeting scheduled for himself, Alexander, and the staff of one of the facilities he supervised. When he arrived, only Alexander and one other employee were present. Alexander chastised him and asked why the remaining staff members were not present. Alexander then scolded Plaintiff before terminating the discussion and leaving the facility. In his deposition, Plaintiff explained that he informed his employees of the meeting by posting a notice on the facility's bulletin board and he did not know why they did not attend. (SOF at ¶ 54); (Plaintiff Dep. at 43:20-46:23).

- When a van owned by Merakey was temporarily unaccounted for, Alexander accused Plaintiff of losing or, in the alternative, stealing the van. The parties later discovered that the van had been with a mechanic during the time in question. (SOF at ¶ 32, 61); (Plaintiff Dep. at 124:1-23).

- Plaintiff alleges that Alexander offered professional support and guidance to female staff members but did not support Plaintiff in the same way or allow others to do so. Plaintiff is unable to point to specific instances that illustrate why he believes his female peers received such preferential treatment. (SOF at ¶ 23, 33, 52); (Plaintiff Dep. at 26:16-27:21, 37:7-41:8).

- Plaintiff alleges that his female subordinates spoke to him "very aggressively" and "in a very disrespectful manner" and refused to follow his instructions. However, when he attempted to raise these issues with Alexander, he was told he would need to "figure out how to work [his] relationship out with [his] female staff [himself]." (Plaintiff Dep. at 24:13 to 25:3).

(SOF at ¶¶ 32, 42-45, 61).

      C.    **Defendant's Justifications for Plaintiff's Termination**

During his four months as a program director at Merakey, at least twelve of Plaintiff's subordinates filed formal complaints against him alleging he was underpaying them, improperly managing the schedule by scheduling staff without notice and on days when they were unavailable, or speaking to them in a demeaning and aggressive manner. Another subordinate, Imani Barnes ("Barnes") accused Plaintiff of attempting to initiate an unwanted romantic relationship with her. When she rebuffed his alleged advances, she began receiving unsettling text messages from unknown numbers which she believed to have been sent by Plaintiff. Barnes also alleges that in retaliation for rejecting his advances, Plaintiff reported her for violating company policy by leaving

4

her work site, an incident he had previously agreed to ignore. Plaintiff denies pursuing a romantic relationship with Barnes, retaliating against her, or sending the texts in question.

Plaintiff's supervisor, Alexander, also accused Plaintiff of speaking to her in an aggressive and confrontational manner, which at least one person witnessed. Alexander testified in her deposition that during a supervisory meeting in her office, she asked Plaintiff to leave, and he leaned forward and asked, "and if I don't?" in a threatening manner. Plaintiff does not deny "yelling" at Alexander, but he denies threatening her or physically leaning towards her. Defendant alleges that Alexander attempted to address the complaints Plaintiff's subordinates made against him during these supervisory meetings, but Plaintiff denies this. Finally, a resident at one of Plaintiff's facilities complained to Adult Protective Services after Plaintiff allegedly failed to separate the resident from a peer who physically threatened and later assaulted the resident. (SOF at ¶¶ 21-22, 27-29, 35, 60); (SOF, Ex. 11, "Various E-mails from Staff"); (SOF, Ex. 14, "Various Emails from Staff"); (SOF, Ex. 18, Statements of Imani Barnes and Plaintiff); (Response at ¶¶ 21-22, 27-29).

### D.  Plaintiff's Termination and Lawsuit

On October 23, 2019, Plaintiff wrote an email to Alexander's supervisor, Executive Director Paul Sachs, explaining that Alexander made him feel "demeened" [*sic*], "humiliated", and "like a child." The next day, Plaintiff called Merakey's Quality and Compliance Organization (QCO) and lodged a similar complaint against Alexander. The same day, HR Supervisor Bush separated Plaintiff from Alexander and placed him under the supervision of Manager Melissa Beckman Nalliah pending an investigation into his dispute with Alexander. According to a report following that investigation, Defendant found that staff allegations against Plaintiff concerning his poor performance and general belligerence were credible and that Plaintiff had failed to

successfully complete his probationary period with the company. Accordingly, HR recommended Plaintiff's termination. (SOF at ¶¶ 26, 32-33).

On November 25, 2019, Sachs terminated Plaintiff's employment. In his affidavit, Sachs indicated that "[t]he decision to terminate Plaintiff was supported by Melissa Bush," of Merakey HR. Plaintiff denies this assertion. Defendant claims that Plaintiff made no formal complaints of gender discrimination at any time during his employment. While Plaintiff does not contest this, he elsewhere alleges that his email to Sachs about Alexander "speaks for itself" and clearly alleges gender discrimination. Plaintiff did not directly raise the subjects of gender or discrimination in either his initial email to Sachs or his correspondence with Merakey's QCO. (SOF at ¶ 32-33, 38, 45); (Response at ¶ 39-40, 45); (Sachs Affidavit).

On January 10, 2020, Defendant received a letter from Plaintiff's counsel alleging that one of Plaintiff's subordinates sexually harassed him during his tenure. This allegation was repeated in Plaintiff's initial filing with the Equal Employment Opportunity Commission ("EEOC"), which he submitted on February 26, 2020. The parties agree that this was Plaintiff's first allegation of sexual harassment against Defendant. Defendant investigated the sexual harassment allegations but found no evidence of wrongdoing.

On May 22, 2020, Plaintiff filed a separate report with the Pennsylvania Human Relations Commission ("PHRC"). This filing repeated Plaintiff's prior allegations of sexual harassment, and added a new charge of gender discrimination. On October 18, 2021, Plaintiff filed his Complaint against Defendant, alleging claims of sexual harassment,[1] gender discrimination, and retaliation.

---

[1]   Shortly before Defendant filed its Motion for Summary Judgment, the parties stipulated that Plaintiff would no longer pursue his sexual harassment claims. (ECF No. 17).

(SOF at ¶ 42-44); (SOF, Ex. 21, Plaintiff's EEOC Filing); (SOF, Ex. 23, Plaintiff's PHRC Filing). (Compl. at ¶¶ 40-59); (Response at ¶ 42-43).

## II.    STANDARD OF REVIEW

Under Fed. R. Civ. Pro. 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials

in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

### III. DISCUSSION

Title VII provides that "it shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The PHRA states that under Pennsylvania law, "[i]t shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . . [f]or any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap . . . of any individual or independent contractor . . . to discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 Pa. Stat. Ann. § 955(a).

Plaintiff alleges two causes of action under Title VII and the PHRA. First, Plaintiff claims that he experienced gender discrimination when Alexander withheld professional support from him, and when Sachs ultimately terminated him. Second, Plaintiff claims that he was wrongfully terminated in retaliation for complaining of the allegedly discriminatory treatment Alexander subjected him to.

Defendant moves for summary judgment as to both claims. With respect to the gender discrimination claim, Defendant maintains that no reasonable jury could find that Plaintiff's gender

was the reason for his termination, or that Defendant's justifications for terminating him were pretextual. As to the retaliation claim, Defendant argues that Plaintiff draws no connection between the alleged complaints he made about gender discrimination and his subsequent termination. For the reasons set forth below, I find that Plaintiff has failed to establish a *prima facie* case of discrimination or retaliation and also cannot point to evidence of pretext.

### A. Gender Discrimination

To establish a claim of gender discrimination under Title VII, a plaintiff-employee must first establish a *prima facie* case. Jones v. School Dist., 198 F.3d 403, 410 (3d Cir. 1999); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). If they succeed in doing so, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the adverse employment action the plaintiff suffered. Id. (quoting McDonnell Douglas Corp., 411 U.S. at 802). If defendant meets this burden of production, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that any proffered justifications are pretextual. Id. The same legal standard applies to claims under the PHRA. See, Joseph v. Cont'l Airlines, Inc., 126 F. Supp. 2d 373, 376 n. 3 (E.D. Pa. 2000); Fleet v. CSX Intermodal, Inc., No. 17-3562, 2018 U.S. Dist. LEXIS 120256, at *20 (E.D. Pa. July 18, 2018).

#### 1. Plaintiff Has Not Established a Prima Facie *Case Of Gender Discrimination*

To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate: (1) that they are a member of a protected class, (2) that they were qualified for the position at issue, (3) that they suffered an adverse employment outcome, and (4) that the factfinder may infer that discrimination was a proximate cause of the adverse employment outcome because either (a) similarly situated persons who are not members of the protected class were treated more favorably, or (b) the adverse employment outcome arose under circumstances that give rise to an inference

9

of unlawful discrimination. Jones, 198 F.3d at 410-11; Warfield v. SEPTA, 460 F. Appx 127, 129-30 (3d Cir. 2012). Here, the parties agree that the first three elements are met.[2] (Def.'s Mot. at 6); (Pltf.'s Opp at 5).

Accordingly, I will focus on the fourth element of Plaintiff's *prima facie* claim and analyze whether a factfinder could infer that gender discrimination was a proximate cause of his termination because either (a) similarly situated female employees were treated preferentially or (b) Plaintiff's termination occurred under circumstances that give rise to an inference of discrimination. Warfield, 460 F. Appx at 129-30.

"Similarly situated" employees need not be "identically situated," but "must nevertheless be similar in all relevant respects." Opsatnik v. Norfolk S. Corp., 335 F. Appx 220, 222-23 (3d Cir. 2009). Which factors are relevant is a context-specific question, but often includes a demonstration

---

[2] The parties agree that Plaintiff's termination was an adverse employment outcome. The parties disagree as to whether Plaintiff suffered an additional adverse employment outcome when Alexander allegedly provided him with less professional support than his female colleagues. (Def.'s Mot. at 9-11); (Pltf.'s Opp. at 8). Specifically, Plaintiff claims that by refusing to intervene in Plaintiff's disputes with his own subordinates, and disallowing others from doing so, Alexander withheld "work related assistance" that "precluded [Plaintiff] from being able to perform his job duties." (Pltf.'s Opp. at 9).

An adverse employment outcome must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." Cadenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). A tangible employment action is one that constitutes "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Durham Life Ins. Co. v. Evans, 166 F.3d 139, 152-53 (3d Cir. 1999) (quoting Burlington Indus. v. Ellerth, 524 U.S. 742 (1998)). While Plaintiff claims that he was "precluded [] from being able to perform his job duties," he does not point to facts in the record that might illustrate how Alexander's alleged behavior so precluded him from performing his work. To the contrary, the facts suggest that Plaintiff's employment continued for weeks after he was placed under Nalliah's supervision, a time during which Alexander's support was completely unavailable to him. (SOF at ¶¶ 32-33, 38, 57). Nor does Plaintiff point to any illustrative examples of his proposition, or to any facts that might establish in what way his "compensation, terms, conditions, or privileges of employment" were substantially impaired by this alleged lack of professional support. Cadenas, 269 F.3d at 263. Title VII does not provide relief for unpleasantness encountered in the workplace. Walker v. Centocor Ortho Biotech. Inc., 558 Fed. Appx. 216, 219 (3d Cir. 2014). Thus, Plaintiff did not suffer an additional adverse employment outcome prior to his termination.

10

that the two employees dealt with the same supervisor, were subject to the same standards, and engaged in the same type of conduct allegedly justifying the adverse outcome without such circumstances as might justify differential treatment. Id. at 223 (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)). The focus of the inquiry into allegedly disfavorable treatment is "on the particular criteria or qualifications identified by the employer as the reason for the adverse action." Warfield, 460 Fed. Appx. at 130 (quoting Simpson v. Kay Jewelers, 142 F.3d 639, 646 (3d Cir. 1998)).

Plaintiff names three female program directors who each reported to Alexander as his comparators. (Pltf.'s Opp. at 6-8); (Alexander Dep. at 19:3-20:5). While it appears plausible that these colleagues are sufficient comparators, Plaintiff does not offer sufficient evidence that they were treated more favorably than he was. The record demonstrates that Plaintiff was terminated for yelling at his supervisor, behaving disrespectfully toward his subordinates, failing to follow company policy in the execution of his duties, and allegedly sexually harassing and retaliating against a subordinate. (Sachs Affidavit); (SOF, Ex. 17, HR Investigation Report); (SOF, Ex. 19, Plaintiff's Termination Letter). When pressed, Plaintiff could not offer specific examples of his comparators engaging in similar behavior. (Plaintiff Dep. at 26:16-27:21, 37:7-41:8). Instead, he merely repeats, without factual support, conclusory allegations that Alexander "seems to be more supportive of the females and not really of [Plaintiff] as a male." (Id. at 37:7-19). Because Plaintiff cannot establish that his female colleagues engaged in the same type of conduct that prompted his termination, he has failed to point to similarly situated comparators who received preferential treatment to satisfy the fourth element of his *prima facie* case. Warfield, 460 Fed. Appx. at 130.

Plaintiff similarly fails to identify facts in the record to support his contention that his termination arose under circumstances giving rise to an inference of discrimination. A factfinder

may draw an inference of discrimination if the record suggests that an otherwise unexplained adverse action was more likely than not based on impermissible considerations. Pivirotto v. Innovative Sys., 191 F.3d 344, 352 (3d Cir. 1999). In support of his claim, Plaintiff points to evidence that he was not invited to a twenty-minute birthday celebration, that his subordinates did not speak to him respectfully, and that Alexander told him he would need to personally deal with these allegedly disrespectful subordinates. (Pltf.'s Opp. at 6-9). Plaintiff does not offer more than bald assertions that any of this alleged mistreatment even implicated his gender, much less lends direct support to his claim that he was terminated because of his gender. Thus, there is no genuine dispute as to any material fact that might permit a reasonable jury to find that Plaintiff was the subject of unlawful gender discrimination during his tenure at Merakey.

        2.     *Plaintiff Has Not Demonstrated Pretext*

Even assuming Plaintiff was able to establish a *prima facie* case, his claim fails because he cannot rebut Defendant's proffered justifications for terminating his employment. Plaintiff concedes that his subordinates complained about his performance, that one subordinate accused him of sexual harassment and retaliation, and that witnesses overheard him yelling at a supervisor. (SOF at ¶¶ 20-22, 24-25, 27-31). These were the same facts offered by Merakey to justify Plaintiff's termination both at the time the decision was rendered and in response to the instant suit. (Sachs Affidavit); (SOF, Ex. 17, HR Investigation Report); (SOF, Ex. 19, Plaintiff's Termination Letter).

Because Merakey has offered a "legitimate, nondiscriminatory" justification for Plaintiff's employment, the burden shifts to Plaintiff to prove that a jury could find by a preponderance of the evidence that the proffered justifications are pretextual. Jones, 198 F.3d at 410. To defeat Defendant's motion for summary judgment, Plaintiff must point to some evidence from which a

factfinder could reasonably infer either that Defendant's justifications were false, or that discrimination was the true cause of his termination. Id. at 412-13. Plaintiff has not met this burden.

First, Plaintiff does not contest the facts underlying Defendant's justifications. Second, as explained above, he cannot offer more than conclusory allegations that he was terminated because of his gender. To support his claim, Plaintiff points to facts suggesting that Alexander declined to intervene in Plaintiff's disputes with his subordinates; that she asked him not to take calls during an interview; that she did not invite him to a twenty-minute birthday celebration; and that she chastised him for failing to organize a scheduled meeting. These allegations simply do not demonstrate pretext. And other portions of the record—such as the numerous and frequent complaints about Plaintiff submitted by his coworkers—strengthen the legitimacy of Defendant's decision to terminate him. Put simply, the record does not support any reasonable contention that Plaintiff was treated differently because of his gender.

Because Plaintiff has not made out a *prima facie* case of discrimination or pointed to any genuine dispute of material fact as to that claim, Plaintiff's gender discrimination claim fails as a matter of law and Defendant's motion for summary judgment as to this claim will be granted.

    **B.**    **Retaliatory Termination**

To establish a *prima facie* case of retaliation under Title VII and the PHRA, a plaintiff-employee must show that: (1) they engaged in activity protected by Title VII, (2) the defendant-employer subsequently took an adverse employment action against them, and (3) their protected activity was the but-for cause of the alleged adverse action. Kengerski v. Harper, 6. F.4th 531, 537 (3d Cir. 2021); Univ. of Tex. Southwestern Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013). The parties agree that Plaintiff's termination constitutes an adverse employment action. Accordingly, only the first and third factors are at issue.

Title VII bars employers from engaging in gender discrimination or retaliating against employees who report an instance of gender discrimination. Moore v. City of Phila., 461 F.3d 331, 341 (3d. Cir. 2006). To prove that their conduct constitutes protected activity, a plaintiff must show that they did more than complain generally about unfair treatment, but instead complained specifically about unlawful discrimination. Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995). Plaintiff claims that he engaged in protected activity when he complained in an email to Paul Sachs and Merakey QCO about Renee Alexander's allegedly differential treatment towards him. (SOF at ¶¶ 32-33). He argues that this email meets the applicable legal standard because the language he used implies discrimination by noting alleged differences in treatment between himself and his female colleagues. Plaintiff's email to Sachs, dated October 23, 2019, reads as follows (all spelling and punctuation as in original):

> Good morning Paul Sachs,
>
> We are at this situation again where I am experiencing hostile, intimidating and aggressive behavior from Renee. I have been questioned about the van incident for American Street with such aggression, force and baraging that I felt very uncomfortable. As I answered questions, Renee basically called me a liar and derelict in my duties in addressing the matter. I made several calls to Mr. Mims regarding the status of the van and found out yesterday from staff that the was returned and that was the vehicle Aaliyah Shaw was driving when she had the accident. I was not notified by the American Street Staff or Mr. Mims that the van was returned and Renee all but blamed me for the van being missing.
>
> The way I was treated by her made me feel like she was grilling me in order to catch me in a lie, and shared the sentiment with her and informed her that it was unfair. Renee, asked who I was talking and I stated I am only telling her how she is making me feel uncomfortable with her treatment. Renee, then accused of talking with other people and getting misinformation on protocol and procedures. I informed Renee, that based on her demand I am not allowed to call other directors for help. She told me I was lying, I then asked for a Red Flag [conflict resolution] Meeting with you and she denied me the right to do so. When I asked again, I was told to lower my voice. I explained that my voice was elevated due to how she is making me feel uncomfortable. I requestd a Red Flag Meeting a second time, and I was deneid. I told that I have the right to make the request and she told me to get

out of her office. As I left her office she hollered from her office that she was calling HR.

> Renee, takes every opportunity to disrespect me; treat in a manner differently than otheras; gives me tasks no instruction and shows her disdain to assist me when I ask for assistance. She provides no positive reinforcement of any kind and makes me feel worthless and an annoyance. In a supervision with her she questioned me about why I was smiling, she asked me if she said something funny that I needed to laugh at? I was humiliated, demeened and felt like a fool for even having been in the supervision. At that instance she took my dignity and made feel like a child instead of a strong hardworking man. On that day and many others when dealing with Renee, I was reduced to a state of nothingness and sadness. I am constantly treated as if I am some badluck child that a parent dislikes. I am honored to work for Merakey and was honored to work for Renee. Do you know what it is like to come to work knowing you do the job of three people and get no assistance or even a thank you for doing what you do? The work is hard, but it's a labor of love. I have worked four over night shifts and never once was told that I get comp time for it and heard it from another Director. I did not complain, I did my job and rolled with the punches as a dedicated employee. I ask that relief is granted and the mistreatment from Renee stops.

(SOF at ¶ 32).

Sachs responded to let Plaintiff know that he was out of the country and could not address the issue immediately. The next day, Plaintiff called Merakey QCO to again complain of his sour relationship with Alexander. The employee who spoke with Plaintiff provided the following summary of their conversation (all spelling and punctuation as in original):

> Caller gave permission to share info outside the QCO. According to the caller his director Renee Alexander has been extremely nasty, disrespectful, and hostile towards him. When he expressed to Renee about wanting to have a red flag meeting with Paul, he was told that he could not have one with him and has not heard from Paul. The caller stated that this issues between he and Renee need to be addressed because it is getting out of hand. The caller stated that Renee takes any opportunity to humiliate him and to make him feel less then. He has asked her for assistance with hiring two new supervisors for vacancies he has at his program and has even scheduled appointments, however Renee cancelled them and told him in a condescending way that he doesn't tell her what dates to schedule, she will tell him. Even when the caller has asked for help, training, and support as he has only been in his position since July, he is met with resistance, hostility, and aggression. The caller stated that he simply wants to do his job effectively however she dismisses him and causes an uncomfortable atmosphere. The caller noted that several employees have complained regarding Renee and the way she treats people.

15

(SOF at ¶ 33).

Nowhere in these correspondences does Plaintiff reference gender discrimination, or even broach the topic of gender at all. Plaintiff also appears to report that Alexander was hostile to other employees as well, which diminishes the plausibility that Plaintiff's gender was the cause of Alexander's alleged ire. In any event, a vague reference to discrimination is not sufficient; a plaintiff must complain specifically about unlawful discrimination. Barber, 68 F.3d at 702. Thus, Plaintiff has not established that he engaged in protected activity for purposes of his *prima facie* case of retaliation.

Even if Plaintiff could establish that his activity was protected, he could not demonstrate causation. "A plaintiff asserting a claim of retaliation has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII." Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 257–58 (3d Cir. 2017). As Plaintiff has not met his burden to demonstrate causation for his gender discrimination claim, which only requires a showing that his gender was a "motivating factor" in his termination, he cannot meet the higher burden for his retaliation claim, which requires a showing that his gender was the "but-for" cause for his termination. Id. For the foregoing reasons, Plaintiff's retaliation claim fails as a matter of law and Defendant's motion will be granted.

### IV. CONCLUSION

For the reasons stated above, Plaintiff has not demonstrated that he was terminated because of his gender. He also has not shown that Defendant's decision to terminate him was in retaliation for any gender-based complaints. For these reasons, his claims fail as a matter of law and Defendant's motion for summary judgment will be granted.

An appropriate Order follows.